**UNITED STATES of America, Appellee,**

v.

**Vincent D. MILLAN, Appellant.**

No. 89–2344.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 16, 1990.

Decided Aug. 31, 1990.

Robert G. Duncan, Kansas City, Mo., for appellant.

Peter M. Ossorio, Kansas City, Mo., for appellee.

Before McMILLIAN and MAGILL, Circuit Judges, and HANSON,* Senior District Judge.

McMILLIAN, Circuit Judge.

Vincent D. Millan was convicted of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). For reversal, Millan argues that the district court erred in denying his motion to suppress evidence obtained from an unlawful seizure of his person and subsequent search of his jacket and garment bag. We agree and accordingly reverse Millan's conviction.

I.

Millan arrived at the Kansas City International Airport at 7:10 a.m. on January 26, 1989, on a Braniff flight from San Francisco. He was one of the first passengers off the airplane, wore a brown leather aviation-style jacket and carried a dark blue gar-

ment bag. He had a gold chain around his neck and hair almost to his shoulders. Millan walked briskly through the airport and proceeded directly to a taxi stand.

Agent Carl Hicks of the Drug Enforcement Agency was assigned to the Kansas City airport on the day of Millan's flight along with two Platte County Deputy Sheriff detectives, Paul Carrill and Robert Burdiss. Hicks was watching for drugs being smuggled through the Kansas City airport and was monitoring incoming flights from Los Angeles and San Francisco. Carrill and Burdiss were present for Hicks' protection. Hicks noticed Millan disembark and followed Millan through the airport to the taxi stand. Carrill and Burdiss stood several feet away from Millan while Hicks approached him, displayed his badge and asked Millan if he could ask him a few questions. Millan consented. At Hicks' request Millan produced a one-way ticket from San Francisco which was purchased in cash the day before the flight. The ticket was issued to Vincent Millan and cost $179. Millan also pulled from his back pocket a Missouri driver's license in the same name.[1] Millan explained he had been in San Francisco visiting his cousin and was returning home to Kansas City, but he could not remember his cousin's address or telephone number. As Millan began searching his pockets for the address, Hicks noticed two bulges in the inner pockets of Millan's leather jacket which was unzipped and fastened at the waist.

Suspecting the bulges to be narcotics, Hicks displayed his badge again and told Millan he was with the Drug Enforcement Agency. Hicks asked Millan if he was transporting any drugs from San Francisco, which Millan denied. Hicks then asked Millan if he could search his garment bag and Millan consented. Hicks chose not to search the bag and instead told Millan he suspected that Millan was carrying drugs in the pockets of his jacket. Millan denied having anything in his pockets and gave

---

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. When Hicks first observed Millan disembarking the airplane, he did not believe Millan was carrying any identification because he did not observe a wallet in Millan's pocket.

Hicks permission to touch the jacket. Hicks felt a powdery substance in the pockets and asked Millan how much drugs he was carrying. Millan replied, "none that I put there." When Millan refused to consent to a warrantless search of his jacket, Hicks told Millan he would take the jacket and bag to the sheriff's office and apply for a warrant. While Hicks was filling out a receipt for the items, Millan attempted unsuccessfully to reach his lawyer by telephone. Hicks left the airport with Millan's jacket, garment bag and airline ticket.

At the Platte County Sheriff's office, Hicks began preparing a search warrant affidavit while Detective Carrill subjected Millan's jacket and garment bag to a dog sniff by police dog Gunner. Gunner was trained only to detect marijuana, cocaine and heroine but not amphetamines or methamphetamines. Gunner did not alert to the presence of narcotics in Millan's jacket or garment bag. Carrill informed Hicks and Burdiss of Gunner's non-alert. After Hicks completed a draft of the affidavit, Millan's possessions were subjected to another dog sniff by Missouri Highway Patrol dog Osco. Osco, like Gunner, was trained to detect cocaine, marijuana and heroine but not amphetamines. Osco did not alert to the presence of narcotics. Hicks and Burdiss were also apprised of Osco's non-alert.

The affidavit was completed and signed by Detective Burdiss. It contained all of the information obtained at the airport but made no mention of the dog sniffs. A warrant was issued and two plastic bags containing a white powder substance were found in Millan's jacket. The officers conducted a field test on the substance for the presence of amphetamines which yielded a positive result. The bags were sent to a crime laboratory and the laboratory test revealed that they contained 500.9 grams of 97% pure cocaine. Millan's garment bag contained a box of plastic bags, paper on which was written financial calculations, and clothing.

Before trial, Millan moved to suppress the evidence seized at the airport including the contents of his garment bag and the cocaine found in his jacket. The motion was referred to a magistrate who recommended that the evidence be suppressed. After a de novo hearing, the district court denied Millan's motion to suppress. Millan waived his right to a jury trial and submitted the case to the court on stipulated facts. The court found him guilty of possession with intent to distribute over 500 grams of cocaine. This appeal followed.

II.

The sole issue for our review is whether the district court erred in denying Millan's motion to suppress. Millan argues that his motion should have been granted because Agent Hicks did not have a reasonable and articulable suspicion to stop and question him about drugs at the airport.[2] *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). He argues that all the evidence obtained after Hicks displayed his badge for a second time was tainted by the unlawful seizure and should have been suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We agree.

 Millan concedes that the initial encounter he had with Hicks was consensual and therefore did not implicate the fourth amendment. However, Millan argues, and we agree, that the consensual encounter turned into a fourth amendment seizure when Hicks showed Millan his badge for the second time and began questioning Millan about drugs. *United States v. Nunley*, 873 F.2d 182, 184–85 (8th Cir.1989) (consensual encounter turned into a seizure when the agent told the defendant he was there to stop the flow of drugs through the airport); *United States v. Sadosky*, 732 F.2d 1388, 1392–93 (8th Cir.) (consensual encoun-

---

2. Millan alternatively argues that his motion should have been granted because (1) Hicks did not have probable cause to seize his jacket and garment bag, (2) the seizure of his possessions lasted an unreasonably long period of time, and (3) the search warrant affidavit contained material omissions that rendered the search warrant invalid. We need not address these alternative grounds for reversal because we agree with Millan that the initial seizure was unlawful.

ter became a seizure when the agent revealed he was investigating narcotics violations and wanted to question the defendant because of his unusual behavior), *cert. denied*, 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984). For this type of seizure to be lawful under the fourth amendment, the government must show that Hicks had a reasonable and articulable suspicion that criminal activity was underway. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). A *Terry*-type stop is justified if the government can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Id.* at 21, 88 S.Ct. at 1880. While the level of suspicion an officer must possess is less than probable cause it must be more than just an "unparticularized suspicion or hunch." *Id.* at 27, 88 S.Ct. at 1883.

■ The totality of the circumstances known to Hicks at the time of the seizure does not supply the requisite level of suspicion to justify the intrusion into Millan's fourth amendment rights. Before he displayed his badge for the second time, Hicks knew that Millan (1) arrived on an early morning flight from San Francisco, (2) was one of the first passengers to deplane, (3) carried a garment bag and no checked luggage, dressed casually, wore a gold chain around his neck and had long hair, (4) walked rapidly through the airport without distraction, (5) purchased his one-way ticket with cash the day before the flight, (6) was not traveling under an assumed name, (7) said he had been visiting his cousin but could not remember his cousin's address or telephone number, and (8) had something evenly-shaped in the inner pockets of his leather bomber jacket. Because these circumstances "describe a very large category of presumably innocent travelers," they cannot, without more, justify the seizure. *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam).

While we recognize that each case must be decided on its own set of facts, a review of some cases in which courts have found reasonable suspicion to justify a *Terry*-type seizure helps establish the parameters of the reasonable suspicion standard. The most recent case in which the Supreme Court upheld an airport stop, *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), involved behavior far more suspicious and unusual than Millan's. In *Sokolow*, the police were aware that the defendant had paid $2,100 for two airplane tickets from a roll of $20 bills and was traveling under a name that did not match the name under which his telephone number was listed. 109 S.Ct. at 1583. Likewise, in *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983), the defendant was traveling under an assumed name. Finally, in a case decided by this court, *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir.1987), the defendant gave untruthful answers during a consensual encounter with the police. In sharp contrast to these cases, Millan gave Hicks no objective reason to suspect Millan was supplying false identification or lying about his trip to San Francisco.

■ This case is also distinct from cases which have rested on the officer's perception of a suspicious bulge in the defendant's clothing. In *United States v. Aguiar*, 825 F.2d 39, 41 (4th Cir.), *cert. denied*, 484 U.S. 987, 108 S.Ct. 505, 98 L.Ed.2d 503 (1987), the agent noticed a bulge on the defendant's ankle and white plastic showing beneath the cuff of his trouser. In *United States v. Harrison*, 667 F.2d 1158, 1160, 1161 (4th Cir.), *cert. denied*, 457 U.S. 1121, 102 S.Ct. 2937, 73 L.Ed.2d 1335 (1982), agents observed for approximately eight seconds a four to six-inch long bulge on the defendant's back *beneath* his jacket. In contrast to these cases, Hicks' belief that Millan's pockets contained narcotics could not have been anything more than a hunch. The bulges Hicks noticed were in Millan's coat pockets, not in an unusual location, and Millan could have been carrying his wallet, gloves, or a hat in those pockets. Reasonable suspicion requires some particularized suspicion about the individual that is more than just a hunch.

*Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754.

All the other factors relied upon by the government are characteristics about Millan that match a drug courier profile and are insufficient to justify the seizure. Although the Supreme Court recently recognized the evidentiary significance of factors that are set forth in a drug courier profile, it did not overrule the oft-cited principle enunciated in *Reid v. Georgia* that these factors alone, without some reasonable suspicion relating to the particular conduct of the individual, cannot justify a *Terry* stop. *United States v. Sokolow,* 109 S.Ct. at 1587; *see United States v. Poitier,* 818 F.2d at 683 (citing *Reid v. Georgia,* 448 U.S. at 440–41, 100 S.Ct. at 2753–54). In *Reid v. Georgia,* the Supreme Court held that the one factor relied upon by the government which related to the particular conduct of the suspects was "too slender a reed to support the seizure." 448 U.S. at 441, 100 S.Ct. at 2754. According to the Court, the officer's suspicion that the two suspects were attempting to conceal the fact that they were traveling together was "a belief that was more an inchoate and unparticularized suspicion or hunch than a fair inference in the light of his experience." *Id.* (citation omitted). The only other evidence the government could point to was the fact that the suspects matched a drug courier profile. The Court refused to justify the search on this evidence because it "describe[s] a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.*

Hicks' belief that Millan's jacket pockets contained narcotics is "too slender a reed" to justify the seizure. *Id.* The additional fact that Millan acted in a manner "typical of persons unlawfully carrying narcotics," which today encompasses all types of travel behavior, is insufficient without more to justify the seizure. *Id.* at 440, 100 S.Ct. at 2753; *see United States v. Sokolow,* 109 S.Ct. at 1588–89 (Marshall, J., dissenting) (describing behavior which is now considered typical of drug couriers). Accord-

ingly the judgment of the district court denying Millan's motion to suppress and finding him guilty must be reversed.

MAGILL, Circuit Judge, dissenting.

I respectfully dissent for two reasons. First, the majority errs in holding that agent Hicks' detention of Millan was not supported by a reasonable and articulable suspicion. Second, even assuming the majority is correct, it nevertheless ignores this court's settled doctrine that the *Leon* good faith exception can cure the taint of evidence illegally obtained pursuant to an invalid detention when that evidence is used to obtain a warrant. *United States v. White,* 890 F.2d 1413, 1414, 1419 (8th Cir. 1989); *see also United States v. Thorton,* 746 F.2d 39, 48–49 (D.C.Cir.1984); *United States v. Thomas,* 757 F.2d 1359, 1366–68 (2d Cir.1985).

I.

I agree with the majority that when agent Hicks showed Millan his police identification for the second time, informed him that he was with the DEA assigned to the airport, and asked Millan if he had brought any drugs from San Francisco, the consensual encounter became a *Terry*-type seizure. However, I believe that agent Hicks possessed a reasonable and articulable suspicion that Millan possessed drugs when the consensual encounter became a *Terry*-type seizure. Agent Hicks possessed the following information immediately before the consensual encounter turned into a seizure. Agent Hicks knew that Millan's flight originated in a source city, that Millan had no checked luggage and carried only a garment bag, dressed casually, had long hair almost to his shoulders, wore a gold chain around his neck, walked quickly out of the terminal to a taxi stand without looking from side to side, purchased a one-way ticket from a source city to a use city, paid cash for his ticket, and could not remember either the address or telephone number of his cousin he said he had just visited in California. Furthermore, agent Hicks observed what appeared to be evenly

shaped bulges about four inches in diameter and one inch thick in the inside pockets of Millan's leather jacket.

In *Nunley*, this court found that the officer had a reasonable, articulable suspicion that Nunley might be involved in criminal activity on less information. We based our conclusion upon their knowledge that Nunley purchased a one-way ticket with cash minutes before departure, was traveling without baggage, and acted nervously and moved erratically through the airport as if she were waiting to meet someone or seeking to evade the authorities. *Id.* at 185. Agent Hicks not only observed that Millan exhibited several of these suspicious behavioral characteristics, but more importantly noticed suspicious bulges on each side of Millan's jacket. Although Millan's behavior at this point was consistent with innocent activity, taken together as a whole and viewed from the standpoint of agent Hicks, an experienced officer who had seventeen years of narcotics experience and had been assigned to the drug interdiction efforts at the airport for fifteen months, a reasonable and articulable suspicion existed that Millan possessed narcotics. *United States v. Sokolow*, 109 S.Ct. 1581, 1586 (1989); *cf. United States v. Aguiar*, 825 F.2d 39, 41 (4th Cir.1987) (bulge at suspect's ankle when combined with behavior consistent with several profile characteristics sufficient to establish probable cause).

Because I believe that the *Terry* stop was legal, I examine the remainder of Millan's arguments attacking the district court's denial of his motion to suppress. Millan argues that even if the *Terry* stop were valid, agent Hicks' seizure of his jacket and garment bag [1] on less than probable cause violated the fourth amendment because the detention lasted for an unreasonable period of time. Because agent Hicks had a reasonable and articulable suspicion that Millan's jacket contained narcotics, he could justifiably detain the jacket to investigate the circumstances that aroused his suspicion, provided that the investigative detention was properly limited in scope. *United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). Therefore, the inquiry would normally be directed at determining whether the scope of the seizure was properly limited. However, I need not reach that issue because I would hold that agent Hicks had probable cause to seize Millan's jacket. Therefore, the time and scope limitations of a *Terry*-type seizure are not applicable, *see, e.g., id.* 462 U.S. at 709, 103 S.Ct. at 2646; *United States v. Large*, 729 F.2d 636, 639 (8th Cir.1984), and the seizure of his jacket pending an application for a search warrant was proper. *See Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

1. I do not find it necessary to address the merits of Millan's claim that the evidence seized pursuant to a search of his *garment bag* should have been excluded. Even if the detention of his bag had been for an unreasonable period of time and the subsequent search unconstitutional, the denial of his motion to suppress the evidence seized from the bag was harmless. *United States v. Civella*, 666 F.2d 1122, 1130 (8th Cir. 1981). First, although the district court mentioned the items seized in the bag in its statement of facts, its finding of guilt was not dependent upon any of these items. The court stated, "[b]ased upon the large amont [sic] of cocaine possessed by the defendant, it [sic] very high purity and the interstate transportation of the cocaine the Court finds that defendant possessed that cocaine with the intent to distribute rather than for his own use." Therefore, because the paper with figures on it and the empty zip-lock bags were not necessary to support this conclusion, the district court's refusal to exclude them, even if in error, was harmless. Second, the evidence of Millan's guilt was overwhelming. Therefore, any error which resulted from the district court's refusal to exclude the evidence seized pursuant to a search of his bag did not affect his substantial rights. Millan was found in possession of 500.9 grams of 97% pure cocaine shortly after deplaning from a flight which originated in a source city in another state, he acted suspiciously in the airport and lied to officers about the contents of his jacket pockets. Therefore, I would not reverse his conviction on the grounds that the officers illegally detained his bag. *Cf. United States v. Ehlebracht*, 693 F.2d 333, 339 (5th Cir. Unit B 1982) (evidence that defendant traveled from Miami, a source city, to Kansas City, a use city, possessed 4 ounces of 63% pure cocaine, which was much higher than the 10% to 15% pure cocaine normally sold in the streets in Kansas City, and testimony that odds overwhelmingly against the ability of Kansas City drug user to contact cocaine wholesaler in Miami constituted sufficient evidence to sustain conviction).

After the consensual encounter became a *Terry*-type stop, agent Hicks uncovered additional information before seizing Millan's jacket and bag. Agent Hicks informed Millan that he had noticed two suspicious bulges in his jacket pockets. Millan denied having *anything* in his pockets. Agent Hicks asked and received permission to touch the jacket pockets. After carefully feeling the jacket pockets, both on the inside and outside lining, agent Hicks not only discovered that Millan had lied about having nothing in his pockets but he felt what he believed to be narcotics in a plastic bag or wrapper. Agent Hicks then asked Millan how much narcotics he had in his jacket. Millan did not deny having drugs in his possession. He merely stated, "None that I put there." [2] I would hold that these additional discoveries were enough to convert the officer's reasonable and articulable suspicion of ongoing criminal activity into a fair probability that narcotics would be found.

In *Aguiar,* the court held that while behavior consistent with a number of drug courier profile characteristics were not alone sufficient to constitute probable cause for arrest, the policeman's observation of a bulge at the suspect's ankle, when combined with the profile characteristics, was enough to constitute probable cause. *Aguiar,* 825 F.2d at 41. The existence of probable cause in this case is more pronounced than in *Aguiar.* Not only was Millan's behavior at the airport suspicious and consistent with several drug courier profile characteristics, but he had two odd bulges in the front two pockets of his jacket. Even if this behavior was not sufficient to establish probable cause, when combined with the fact that Millan lied about the existence of the suspicious bulges in his jacket, the pockets appeared to contain narcotics, and Millan did not explicitly deny that he had drugs in his possession, the officers had probable cause to seize the jacket pending application for a search warrant. This additional information at agent Hicks' disposal was far more incriminating than the officer's mere observation of a strange bulge at a suspect's ankles in *Aguiar.*

My conclusion that agent Hicks had probable cause is bolstered by his expert sense of touch stemming from his examination of over one thousand containers of narcotics. Agent Hicks is an experienced officer who has felt narcotics in packages over one thousand times. After hearing his testimony and examining the jacket he searched, the district court found his "testimony regarding his beliefs about the contents of the pocket to be credible." *United States v. Millan,* No. 89–00033–01–CR–W–9–3, slip op. at 9 (W.D.Mo. Apr. 11, 1989). This court is particularly reluctant to set aside those district court's findings that turn on the credibility of witnesses. *See Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The district court found that agent Hicks believed that located in the jacket pockets was some form of powder in a container normally used to transport narcotics. This finding is not clearly erroneous, but well-supported by the record. Even standing alone, it strongly supports the existence of probable cause. *Cf. United States v. Williams,* 822 F.2d 1174, 1182–85 (D.C.Cir.1987).[3] Therefore, based upon all of the information agent Hicks possessed, I would hold that he had probable cause to seize Millan's jacket.

In a final attempt to reverse his conviction, Millan argues that the search warrant is invalid because it was based upon an affidavit from which the officers intentionally left out the existence of two negative dog sniffs. As a preliminary matter, I note

---

**2.** *See United States v. Mancini,* 802 F.2d 1326, 1329 (11th Cir.1986) (probable cause established when suspect answered police request to search bags with "[w]hat happens if I do have drugs?").

**3.** In *Williams,* the D.C. Circuit established a plain touch exception to the warrant requirement. Under this exception, "no warrant is needed for an opening of a container whose contents become known through a lawful touching of the outside." *Id.* at 1184. Because I believe that agent Hicks had probable cause to seize his jacket and because he did obtain a search warrant, I need not examine the propriety of this plain touch exception to the warrant requirement.

that this court must give considerable deference to the magistrate's initial determination that probable cause exists. *Illinois v. Gates,* 462 U.S. 213, 230, 236, 238–39, 103 S.Ct. 2317, 2328, 2331, 2332–33, 76 L.Ed.2d 527 (1983); *Search of 4801 Flyler Avenue v. Householder,* 879 F.2d 385, 389 (8th Cir. 1989), *cert. denied sub nom. Kiesel Co., Inc. v. Householder,* ——— U.S. ———, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990); *United States v. Robinson,* 756 F.2d 56, 59 (8th Cir.1985). In this case, the issuing judge did make an initial finding of probable cause based upon the affidavits submitted by the officers. However, after discovering that he had not been informed about results of the two negative dog searches, the issuing judge swore in an affidavit that had he known about the negative results, he would not have issued the warrant.[4] Where, as here, a defendant challenges the validity of a warrant on the basis that the officers included false information in the affidavit which established probable cause or omitted material information that would refute the existence of probable cause, great deference is not appropriate. *See United States v. Leon,* 468 U.S. 897, 914–15, 104 S.Ct. 3405, 3416–17, 82 L.Ed.2d 677 (1984) (deference to issuing magistrate not boundless and inquiry into knowing or reckless falsity on affidavit not precluded). The omission from the affidavit of the negative dog searches is fatal to the warrant if Millan met his burden of demonstrating (1) that the officers " 'omitted facts with the intent to make, or in reckless disregard of whether they thereby made the affidavit misleading' " and (2) that " 'the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.' " *United States v. Lueth,* 807 F.2d 719, 726 (8th Cir.1986) (quoting *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986)); *see Franks v. Delaware,* 438 U.S. 154, 156, 171–72, 98 S.Ct. 2674, 2676, 2684–85, 57 L.Ed.2d 667 (1978); *United States v. Par-*

*ker,* 836 F.2d 1080, 1083 (8th Cir.1987), *cert. denied,* 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988).

The district court found as a matter of fact that the failure

> to mention the negative canine searches [was not] an intentional or reckless effort to mislead the issuing magistrate. Agent Hicks testified that several drugs, including cocaine, heroine [sic], PCP, amphetamine and methamphetamine are packaged and transported in a manner consistent with his observations of the defendant. The dogs who examined [Millan's] jacket are only trained to detect marijuana, cocaine, or heroine [sic]. The Court finds that the agent and the detectives had an entirely reasonable belief that the negative results of the canine searches were not clearly critical [sic] to their application for a search warrant in that they believed, as a result of the canine searches, that the substance in the coat was a form of amphetamine. The agent's testimony in this regard is corroborated by their initial testing of the substance as amphetamine rather than cocaine and the statement to the laboratory that the substance being sent for analysis was methamphetamine. [T]he Court finds that ... invalidation of the warrant is not required.

*United States v. Millan,* No. 89–00033–01–CR–W–9–3, slip op. at 10–11 (W.D.Mo. Apr. 11, 1989). While agent Hicks' experience might provide some basis for one to conclude that his failure to include the negative dog searches in the affidavit was reckless, as a reviewing court, it would not be appropriate for us to reverse merely because there would be some basis to arrive at the opposite conclusion. *United States v. Sadosky,* 732 F.2d 1388, 1391 (8th Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984) (reviewing court must accept the district court's factual findings unless clearly erroneous); *see also*

---

**4.** Although the issuing judge stated that he would not have issued the search warrant if he had known about the two dog searches, he never stated that the officers knowingly, intentionally or recklessly omitted the information from the affidavit. Second, although the judge proba-

bly knew that Gunner was not trained to locate amphetamines, there is no evidence in the record that when he swore out the affidavit, he knew the other dog also could not locate amphetamines. Therefore, the impact of his affidavit is limited.

*Anderson v. Bessemer City*, 470 U.S. at 573, 105 S.Ct. at 1511 (reviewing court cannot reverse a district court's factual findings merely because it is convinced that it "would have decided the case differently"). Because there is substantial evidence in the record to support the district court's factual findings, I do not believe they can be characterized as clearly erroneous. I would therefore hold that the two negative dog searches were not omitted from the affidavit with the intent to make, or in a reckless disregard of whether they made, the affidavit misleading. Therefore, I would not invalidate the search warrant. *See Parker*, 836 F.2d at 1083 (omission of informant's criminal history not deliberately or recklessly false when search warrant application based on information from two informants and at least partially corroborated by independent police investigation); *Lueth*, 807 F.2d at 726 (affiant's statement regarding informant's "proven reliability" not false or made with reckless disregard when affiant testified he was aware of FBI and local law enforcement agencies' termination of informant's services but his confidence in informant's reliability remained high).[5]

## II.

In failing to determine whether the good faith exception operates in this case to cure the taint of what the majority held to be evidence illegally obtained pursuant to an invalid detention, the majority ignores settled precedent in this circuit. In *United States v. White*, this court held that the

> officers who detained [White] in Lambert International Airport lacked an adequate basis to form the reasonable, articulable

suspicion of ongoing or imminent criminal activity required by *Terry* .... The search that White challenges, however, was authorized by a warrant (obtained by the officers on the basis of information gained during their warrantless detention of White). It was objectively reasonable (even though legally incorrect) for the officers to believe that the information contained in the affidavit for the warrant was lawfully obtained. White was therefore not entitled to have the evidence excluded, *United States v. Leon*, and we affirm his conviction.

*White*, 890 F.2d at 1414 (citations omitted). The majority errs when it reverses after merely holding that the detention was not supported by a reasonable and articulable suspicion of ongoing criminal activity. *White* instructs that the inquiry not end there. Agent Hicks did not open and search the luggage until he had "prudently obtained [a] warrant[ ]." *Id.* at 1419. As we said in *White*, this "step, which the law encourages, brings into play the rule of *United States v. Leon*." *Id.* Even assuming the fourth amendment was violated by the illegal stop, the facts of this case are close enough that it was objectively reasonable (even if legally incorrect) for the officers to believe that the information contained in the affidavit for the warrant was lawfully obtained. *Id.* at 1414. The purchase of the one-way ticket for cash from a source city to a use city, Millan's lack of checked baggage, quick exit from the terminal to the taxi stand, inability to remember either the address or telephone number of his cousin who he claimed to have visited in California, and the appearance of evenly shaped bulges about four inches in di-

---

**5.** Even if the district court's findings were clearly erroneous, the search warrant would still be valid. As I explained, agent Hicks had probable cause to seize Millan's jacket. Therefore, he also had probable cause sufficient to obtain a search warrant unless the negative dog sniffs refuted the existence of probable cause. *Parker*, 836 F.2d at 1083 ("omissions of facts are not misrepresentations unless they cast doubt upon the existence of probable cause").

The two dogs could only detect the presence of three drugs: marijuana, cocaine and heroin. Therefore, at most, the negative dog sniffs only refuted the existence of probable cause for the

presence of those three drugs. They had no effect on the existence of probable cause that the jacket contained another drug such as amphetamine. I believe that the affidavit would have still provided probable cause to issue the search warrant even if the negative results had been included in the affidavit. *Accord Schmid v. State of Alaska*, 615 P.2d 565, 577 (Alaska 1980) (although officer failed to inform issuing magistrate of a negative dog sniff, probable cause still existed to issue the search warrant). Therefore, the evidence seized from the jacket, in my opinion, was properly admitted against Millan.

ameter and one inch think in the inside pockets of his leather jacket "pushes this case into the gray area created by *Leon.*" *Id.* This information, combined with other information obtained pursuant to the "illegal detention," *supra* at 1015–1017, was placed in the search warrant affidavit. Because it was objectively reasonable for agent Hicks to believe the information he gathered pursuant to the illegal detention and placed in the affidavit was lawfully obtained, he had a good faith belief in the validity of the warrant.[6] I would affirm his conviction. *See id.*

### III.

For the foregoing reasons, I believe the majority errs in holding that the district court improperly refused to grant Millan's motion to suppress.

---

**6.** Furthermore, as I explained, *supra* at 1018, I would not find the district court's factual finding that agent Hicks and the detectives "had an entirely reasonable belief that the negative results of the canine searches were not clearly criticial [sic] to their application for a search warrant in that they believe, as a result of the canine searches, that the substance in the coat was a form of amphetamine" to be clearly erroneous. Therefore, the officers' failure to include the dog sniff on the warrant does not bring us out from under the good faith exception.