972 F.2d 344
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Howard TATE, a/k/a Howard Brown, Defendant-Appellant.
 No. 91-5785.
 United States Court of Appeals,
Fourth Circuit.
 Submitted: November 13, 1991
Decided: July 28, 1992
 
 Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert D. Potter, District Judge. (CR-90-60-C)
 Rodney S. Toth, Charlotte, North Carolina for Appellant.
 Thomas J. Ashcraft, United States Attorney, H. Thomas Church, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.
 W.D.N.C.
 Affirmed.
 Before RUSSELL and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Howard Tate, a/k/a Howard Brown, appeals from the district court's denial of his Motion to Suppress Evidence. Tate unsuccessfully sought suppression of a quantity of cocaine base seized from his person without a warrant. He then pled guilty to one count of possession with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) (1988), reserving the right to appeal the suppression decision pursuant to Fed. R. Crim P. 11(a)(2). After reviewing the parties' briefs and the record, we affirm.
 
 I.
 
 2
 State and local police officers were conducting a routine narcotics interdiction surveillance at the Charlotte Douglas International Airport, in Charlotte, North Carolina, when Tate deplaned a flight from New York City.[1] Tate was wearing a black leather jacket, sweatshirt, loose fitting jeans, tennis shoes, and a large gold ring. He carried a new black bag. He was observed by four officers as he entered the concourse, including Special Agent Kiger, Officer Jones, Agent Davis, and Officer Senate. The officers were dressed in casual clothing and carried concealed weapons.
 
 
 3
 Tate turned as he came off the jetway and made extended eye contact with Jones; he then looked over his shoulder at the officers several times as he walked through the concourse. Jones noticed a bulge on the outside of Tate's left ankle. Jones and Kiger began to follow Tate and, after Tate entered the lower level of the airport, approached Tate and asked if they could speak with him; Tate said "yes." The officers then identified themselves and requested Tate's ticket. The ticket was issued to "D. Cole." When questioned about the name, Tate stated that he was D. Cole. The face of the ticket revealed that it had been purchased on the day of travel with cash and that Tate had presented no identification when buying it.
 
 
 4
 Kiger assured Tate that he was not under arrest and continued casual conversation. Jones noticed that Tate was becoming increasingly agitated and nervous. Kiger then asked Tate for additional identification; Tate stated that he had none. Tate indicated in response to Kiger's further questioning that his carry-on bag was his only piece of luggage, stating "do you want to search it?" Kiger responded, "You don't mind, do you?" Kiger requested consent to search Tate's person, but that request was rebuffed. Tate did consent to the search of his bag, however. Before Jones could complete the search of the bag, Tate grabbed the bag from him, stated that he wanted to call his lawyer, and started to walk away.
 
 
 5
 As Tate began to walk away, Jones noticed a bulge in his chest and followed Tate, asking him about the bulge. Tate stopped briefly and pulled a large medallion from his shirt which he displayed to Jones, then continued to walk on. Jones then backed away. Tate was walking in the direction of Davis, who had been observing the foregoing events from some distance.
 
 
 6
 Davis intercepted Tate, identified himself as a police officer, and began walking next to Tate. Kiger followed closely behind. Davis informed Tate that he was not under arrest. As they were walking, Kiger told Davis about the discrepancy between the name on Tate's ticket and the name on his bag. Davis then asked Tate what his destination was; Tate replied that he was traveling to Kinston, North Carolina. Davis testified that Tate stopped approximately five feet from the phone. Davis then told Tate that the police were going to subject his jacket to a narcotics search by a drug-sniffing dog. Tate removed the jacket and gave it to Davis; a conversation ensued about where the jacket should be sent after the search, as Tate intended to immediately board a flight to Kinston. Davis returned the jacket to allow Tate to remove his plane ticket from the pocket.
 
 
 7
 Davis then noticed a bulge on Tate's left ankle and asked Tate how high his tennis shoes were. Tate responded by pulling his left pant leg up a bit, revealing a bulge in his sock. Davis instantly reached down to pat the bulge and touched something that felt like plastic. Davis then arrested Tate. Senate and Jones took Tate to a nearby restroom and removed a plastic bag from his ankle which later proved to contain 96.3 grams of cocaine base.
 
 
 8
 This case was referred to a magistrate judge pursuant to 28 U.S.C. § 636(b) (Supp. 1991). The magistrate judge denied Tate's Motion to Suppress on the basis that the initial stop of Tate was not a seizure, that Davis had probable cause to arrest Tate, and that even if Davis had lacked probable cause, the facts known to Jones and Kiger could be imputed to Davis, thereby establishing probable cause. The magistrate judge determined that the seizure of Tate's jacket, although illegal, was not causally connected to the subsequent arrest and search of Tate's person, and thus did not warrant suppression of the evidence seized from Tate's person. The district court adopted the magistrate judge's recommendation.
 
 II.
 
 9
 Tate asserts on appeal that he was illegally seized when the officers initially approached him in the airport concourse and engaged him in conversation. This argument is without merit. The Fourth Amendment is not implicated when the police simply approach a person in a public place and ask that person to answer some questions. Florida v. Bostick, 59 U.S.L.W. 4708, 4710 (U.S. 1991); Florida v. Royer, 460 U.S. 491, 497 (1983). Rather, the appropriate test is whether a reasonable person would feel free to leave under the circumstances presented. Royer, 460 U.S. at 502.
 
 
 10
 Tate was approached by Jones and Kiger in a public place. Neither officer was in uniform, and they requested, rather than demanded that Tate speak with them. Tate consented by saying "yes." This case is thus closely akin to United States v. Gordon, 895 F.2d 932 (4th Cir.), cert. denied, 59 U.S.L.W. 3247 (U.S. 1990), where we held that a consensual conversation in an airport concourse between DEA agents and an airplane passenger was a "brief police citizen encounter" which fell outside the purview of the Fourth Amendment, even though the agents had no reason to suspect the passenger of wrongdoing. Id. at 937. This record is devoid of any evidence of coercion. Thus, the magistrate judge's determination that there was no seizure in these circumstances is not clearly erroneous. Id. at 938.
 
 III.
 
 11
 Tate also argues that Davis lacked probable cause to arrest him. Specifically, Tate asserts that the drug courier profile characteristics noted by the officers were insufficient to establish probable cause, that the bulge at his ankle did not create probable cause, that Davis's illegal seizure of the jacket tainted the subsequent arrest and search, and that the magistrate judged erred in imputing knowledge held by other officers to Davis.[2] His arguments are without merit.
 
 
 12
 This case is nearly indistinguishable from United States v. Aguiar, 825 F.2d 39, 41 (4th Cir.), cert. denied, 484 U.S. 987 (1987), in which we held that an officer's observation of a bulge and white plastic on the suspect's ankle combined with other drug profile characteristics, including the suspect's arrival from a source city, the fact that he carried a one-way plane ticket issued in a false name and paid for in cash, and the fact that there was no baggage claim check, established probable cause to arrest the suspect. As we noted in Aguiar, the listed drug profile characteristics alone may have been insufficient to establish probable cause. Id. In combination with the observed bulge, however, these factors were more than adequate to meet the probable cause test.
 
 
 13
 Here, Davis was personally aware of Tate's arrival from a source city, his extended eye contact with the officers, and his appearance. As he and Kiger walked with Tate toward the phone, Kiger informed him that Tate had no identification and that the name appearing on his ticket was different than that on his luggage. Davis then noticed the bulge on Tate's ankle. These facts were clearly sufficient to establish probable cause to arrest under Aguiar. Even if Davis had personally lacked knowledge of facts sufficient to support probable cause, facts regarding Tate's plane ticket known to Jones and Kiger could have been imputed to Davis, irrespective of whether those facts were actually communicated. United States v. Laughman, 618 F.2d 1067, 107273 (4th Cir.), cert. denied, 447 U.S. 925 (1980).
 
 
 14
 The seizure of Tate's jacket, although clearly improper, was not causally related to the subsequent arrest and search of Tate's person. The jacket did not contain contraband and was apparently returned to Tate prior to the arrest. Absent a causal connection, suppression of the cocaine base found on Tate's ankle as fruit of the illegal seizure of his jacket was not warranted. United States v. Clark, 891 F.2d 501, 505 (4th Cir. 1989).
 
 IV.
 
 15
 Lastly, Tate argues that the district court committed plain error under Fed. R. Crim. P. 52(b) in crediting Davis's suppression hearing testimony regarding the location of the bulge on Tate's ankle, without considering prior inconsistent testimony by Davis at the probable cause hearing. This record reveals that Davis testified that the bulge was on the outside of Tate's ankle at the suppression hearing while stating at the probable cause hearing that the bulge was on the inside of Tate's ankle.
 
 
 16
 Assuming arguendo that the district court erred, this error was harmless, as recognition of the inconsistency would not have worked a different result. Fed. R. Crim. P. 52(a). The fact that Jones also observed the bulge on Tate's ankle lends credibility to Davis's assertion that a bulge existed.[3] Whether the bulge was on the inside or the outside of Tate's ankle, it was nonetheless a bulge of the sort often associated with drug couriers and, when combined with other drug courier profile characteristics, added significant weight to the probable cause determination. Harmless error does not justify reversal.
 
 
 17
 Accordingly, we affirm the district court's decision. We dispense with oral argument because the facts and legal contentions are adequately presented and argument would not aid the decisional process.
 
 AFFIRMED
 
 
 [1]
 Our narration of the facts is based on the findings of fact by the magistrate judge, which we find are not clearly erroneous. The magistrate judge discredited Tate's version of events, to the extent Tate's testimony differed with that of the officers
 
 
 [2]
 In light of our conclusion regarding the existence of probable cause, we need not consider Tate's additional argument that the search of his person was not justifiable as a Terry search. Terry v. Ohio, 392 U.S. 1 (1968)
 
 
 [3]
 Jones testified that the bulge was located on the outside of Tate's left ankle